Robert A. GAUDREAULT,
Plaintiff, Appellant,

v.

MUNICIPALITY OF SALEM,
MASSACHUSETTS, et al.
Defendants, Appellees.

No. 90–1501.

United States Court of Appeals,
First Circuit.

Submitted Aug. 28, 1990.

Decided Nov. 19, 1990.

Robert A. Gaudreault, on brief, pro se.

John J. Kuzinevich, Issac H. Peres and Riemer & Braustein, on brief, for defendants-appellees, Mayor, Neil Harrington, Robert St. Pierre, Francis Wrigley, Andrew Ouelette, Garrett Lynch, Rubin Felix, Paul Tucker, and Milton Raymond.

Edward D. McCarthy, Joan Eldridge, McCarthy, Foster & Eldrdidge, on brief, for defendants-appellees, The Salem Hosp., Knight Alexander, M.D., James Durso, M.D., Salem Hosp. Bd. of Trustees, and Maximiliaan G. Kaulbach, President of Medical Staff.

Before CAMPBELL, TORRUELLA and CYR, Circuit Judges.

PER CURIAM.

This appeal concerns an action brought under 42 U.S.C. § 1983. In April 1985 Gaudreault was arrested by the police in Salem, Massachusetts after an altercation at a bar. Gaudreault alleged that the four Salem police officers who arrested him (appellees Lynch, Raymond, Tucker and Felix) violated his constitutional rights by using excessive force in making the arrest. He claimed that he later suffered an assault in the Salem police station at the hands of a fifth, unidentified officer. The alleged attacker has never been made a party to this suit. Gaudreault also charged that the arresting officers and two watch commanders at the police station (appellees Ouelette and Wrigley) denied him medical treatment for a period of some ten hours after his arrest. Finally, he contended that the City of Salem, its mayor, city solicitor and chief of police are liable to him as well, apparently on a "failure to train" theory.[1] The magistrate to whom the district court referred the case granted summary judgment to the Salem Defendants on all claims against them, and this appeal followed. We affirm.

## 1. *The Use of Force During Arrest*

A claim that the police used excessive force in making an arrest must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443, 454 (1989). The pertinent question is whether the force used was "objectively reasonable" under all the circumstances; that is, whether it was consistent with the amount of force that a reasonable police officer would think necessary to bring the arrestee into custody. *See Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir.1988). Proper application of the test of "objective reasonableness" requires the courts to pay careful attention to the facts and circumstances of the particular case at hand, including the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455. We must keep in mind that not every push or shove rises to the level of a constitutional violation, and that police officers making arrests are often forced to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances. *Id.*, at 393–94, 109 S.Ct. at 1871–72, 104 L.Ed.2d at 455–56.

We find that summary judgment was granted appropriately on this claim. The appellees submitted in support of their motion the entire transcript of the appellant's criminal trial on charges arising out of the fracas at the bar. The transcript contains both Officer Lynch's and Gaudreault's versions of the arrest. We have examined this testimony and conclude that no genuine dispute exists as to the "objective reasonableness" of the force employed by the police.

Officer Lynch told the following story. When the police approached Gaudreault at the bar, he was visibly intoxicated, yelling at bar employees and disturbing the patrons. Lynch asked Gaudreault several times to leave the premises. When Gau-

---

1. The complaint also alleged that the "Salem Defendants" had committed a conspiracy against him, 42 U.S.C. § 1985, but Gaudreault did not brief this claim on appeal and has waived it. *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir.1983). Finally, the complaint asserted claims against: (1) the bar in which Gaudreault was arrested, its owner and three of its employees, (2) Salem Hospital (where Gaudreault was treated the day after his arrest), its trustees and several doctors, and (3) the Commonwealth of Massachusetts, its governor and attorney general, the Essex County District Attorney, and the Salem District Court Clerk–Magistrate. The district court dismissed these claims and on February 21, 1989 issued final judgment, under Fed.R.Civ.P. 54(b), on behalf of all but the Salem Defendants. Gaudreault did not file a timely appeal. *See Page v. Preisser*, 585 F.2d 336, 338 (8th Cir.1978). The claims against the dismissed defendants, therefore, are not the subject of this appeal.

dreault refused, Lynch tried to lead him out of the bar by placing a hand on his shoulder. Gaudreault flailed his arm away from Lynch, striking Lynch in the face and forcing him to fall backwards. The officers then attempted to restrain Gaudreault with handcuffs. They never used their guns or clubs, although Gaudreault continued to strike at them. At some point during the fray, Officer Lynch severely injured the ligaments in his thumb. The appellant, on the other hand, did not display any physical injuries when arrested.

While Gaudreault disputed Officer Lynch's testimony on many of its particulars, he corroborated the dispositive facts and even expanded upon Lynch's testimony that he vigorously resisted arrest. According to Gaudreault, Lynch asked him to leave the bar, but he refused. Lynch then placed his hand or hands on Gaudreault, but not in an assaultive manner. Gaudreault resisted this effort, struck Lynch, and continued to resist when at least one other officer (and perhaps a civilian employee of the bar) moved to Lynch's aid. The struggle ended up on the floor, at which point Gaudreault slammed Lynch's head into the bar.[2] The officers then gained control of the situation and handcuffed Gaudreault.

Gaudreault also corroborated Officer Lynch's observation that he was not visibly injured when arrested. Although Gaudreault claims that he suffered bruises and abrasions on the night of his arrest, and offered records from Salem Hospital to document this charge, the complaint (Count Four, Paragraph 4) says that all the injuries reflected in those hospital records were caused by the attack at the police station later that night. It requires only simple deduction from that allegation to conclude that Gaudreault was *not* significantly injured during the arrest.

This much, then, is undisputed: Gaudreault offered active resistance to his arrest, causing Officer Lynch to suffer a painful injury. The police, on the other hand, never drew their weapons and did not cause any notable injury. They can only be said to have tailored their expense of force closely to the violent circumstances facing them. Their behavior was "objectively reasonable" as a matter of law. *See Gassner v. City of Garland, Texas,* 864 F.2d 394, 400 (5th Cir.1989) (arrestee's resistance justified use of force); *Brooks v. Pembroke City Jail,* 722 F.Supp. 1294, 1299 (E.D.N.C. 1989) (same).

### 2. *The Assault at the Police Station*

Count Five of the complaint alleges that when Gaudreault arrived at the police station in the company of Officers Lynch, Raymond, Tucker and Felix, six to eight "unknown police officers" were "playing volleyball" with Michael Messier, Gaudreault's friend who had been sitting with him at the bar and who, apparently, was arrested along with him. The police complied with Gaudreault's request that they cease harassing his friend, and put Messier in a cell in the station's detention area, out of Gaudreault's sight but within his hearing.

Another "unknown police officer" then entered the detention area and goaded Messier to fight. Gaudreault, from the booking room, challenged this unknown officer to take on him instead of his friend. Gaudreault was handcuffed at the time, with Officers Lynch and Raymond standing behind him, and Officers Tucker and Felix standing in front of him.

According to Gaudreault, the officer who had been badgering Messier then entered the booking room from behind Gaudreault. The officer assaulted Gaudreault with a night stick, hitting him in the "right flank," and then with his shoe, kicking Gaudreault about the head and eyes.

Gaudreault's allegations are corroborated to some extent by Messier's affidavit. Messier says that, while locked in his detention cell, two "unidentified police offi-

---

**2.** Gaudreault also testified at his deposition in this civil suit that at some point during the altercation, he received a telepathic communication from an "entity" instructing him to "liqui- date" Officer Lynch. Gaudreault acknowledged that he took this instruction to mean that he "was told to kill that officer."

cers entered the detention area from another door. Although they were unidentified then, I could now identify the officer who reopened my detention cell and demanded that I become a physical combatant. I only weigh 140 lbs and this black police officer was tall and weighed 220 lbs" (Messier Affidavit, ¶ 5). Gaudreault, from the booking room, challenged this officer, who then left the detention area and went to the booking room, which was out of Messier's sight. Messier then heard a "thump" and the scuffling of feet (Messier Affidavit, ¶¶ 6, 7).

Gaudreault also submitted medical evidence to support his story about a beating in the booking room. Records from Salem Hospital show that when Gaudreault was examined the next day, he displayed multiple bruises, to the forehead, left and right orbits of his eyes, nasal area, left ribs, right flank and left shoulder, and was suffering from a corneal abrasion and an abrasion on the upper back. These injuries are consistent with the nature of the assault described in the complaint.

■ Gaudreault's submissions clearly raise a genuine issue as to the *fact* of the assault. A reasonable jury could conclude that the still-unidentified officer attacked Gaudreault after receiving nothing more than verbal provocation, while Gaudreault stood in handcuffs with his back to his assailant. Such an attack would appear to have no justification, and no motive but punishment, and thus would constitute the use of "excessive force."

■ As the magistrate pointed out, however, Gaudreault never identified his assailant. In fact, by placing the blame for the assault on a specific (though unidentified) officer, Gaudreault has in effect admitted that the four officers named in the lawsuit did not participate actively in the assault. Consequently, there is no dispute that defendants Lynch, Raymond, Tucker and Felix cannot be held liable for committing the assault. The police officer who allegedly did commit the assault, meanwhile, is not a defendant in this case.[3]

### 3. *The Delay in Providing Medical Care*

■ In support of their motion for summary judgment on this claim, the Salem Defendants made the following factual assertions: that Gaudreault was "not injured" during his arrest, that he was taken to the hospital the following day because he complained of chest pains, and that he did not display any physical injuries that warranted medical attention. The defendants' memorandum says that these assertions are borne out by two of the defendants' interrogatory answers, but those answers do not appear in the record transmitted to this court.

Gaudreault, in any event, tells a different story. We have already discussed his claim that the attack in the station house caused him multiple bruises and abrasions. In his complaint, moreover, he alleged that on the night of his arrest, both Officer Tucker and Lieutenant Oulette denied his requests for medical attention, despite the fact that he was suffering from "massive swelling" in the head.

Gaudreault's allegation that he was initially denied treatment is again corroborated by the affidavit of Michael Messier. According to Messier, Gaudreault requested medical treatment from Officer Tucker on the night of his arrest, but Tucker responded, "You look alright [sic] to me" (Messier Affidavit, ¶ 10). The following morning, Messier says, Gaudreault asked Captain Wrigley for medical attention.

---

**3.** There was another potential basis of liability. An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance. *See Byrd v. Brishke*, 466 F.2d 6, 10–11 (7th Cir.1972); *Hathaway v. Stone*, 687 F.Supp. 708, 711–12 (D.Mass.1988). Gaudreault did place Officers Lynch, Tucker, Raymond and Felix at the scene of the alleged assault, and one can infer from his allegations that they did not prevent the attack. But Gaudreault's complaint (which contains the only account of the attack in the record) also says that the attack came quickly and was over in a matter of seconds. A police officer cannot be held liable for failing to intercede if he has no "realistic opportunity" to prevent an attack. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir.1988). That clearly was the case here.

Wrigley initially refused (Messier Affidavit, ¶ 10), but acceded and sent Gaudreault to Salem Hospital when Gaudreault asked a visitor to fetch a doctor to the jail (Messier Affidavit, ¶ 14).

■ Taking Gaudreault's allegations and Messier's affidavit testimony as true, we are faced with a situation in which a post-arrest detainee asked for, but was refused medical attention for a period of some ten hours after his arrest. The question is whether such a delay could have constituted a violation of Gaudreault's constitutional rights. The rights implicated here are the due process protections afforded a pre-trial detainee under the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535, n. 16, 99 S.Ct. 1861, 1872, n. 16, 60 L.Ed.2d 447 (1979). The due process clause of the Fourteenth Amendment does require the responsible governmental authorities to provide medical care to persons who have been injured while being apprehended by the police. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). The boundaries of this duty have not been plotted exactly; however, it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner. *Id.*

■ The Eighth Amendment, in turn, imposes a duty to attend to a prisoner's "serious medical needs." *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.1988), citing *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Government officials violate the Constitution if they exhibit "deliberate indifference" to such needs. *Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292. *See also Carapellucci v. Town of Winchester*, 707 F.Supp. 611, 614 (D.Mass. 1989). We find that summary judgment was appropriately granted here because Gaudreault did not display any "serious medical needs" during the hours following his arrest.

■ A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir.1987); *Hendrix v. Faulkner*, 525 F.Supp. 435, 454 (N.D.Ind.1981).

Here, the defendants apparently introduced no medical evidence concerning Gaudreault's condition following his arrest, but Gaudreault did. He submitted the Nursing Progress Notes and Radiology Report prepared at Salem Hospital on the day after his arrest. The Nursing Progress Notes describe the bruises and abrasions noted above, and indicate that the hospital gave Gaudreault a sling for his left arm and a patch for his injured eye, and cleaned the abrasion on his back. The Radiology Report says that x-rays were taken of Gaudreault's facial and nasal bones, his cervical spine, left shoulder and left ribs. All were found "normal."

The doctors and nurses who examined Gaudreault on the morning after his arrest, in short, found him bruised but unbroken, requiring no more medical care than a sling, an eye-patch and the application of some disinfectant. If that was all the medical professionals could find to treat, we do not think that Gaudreault's jailers could be required to see more. While Gaudreault's injuries may have been "obvious" in the sense that his bruises and abrasions were visible, the medical record demonstrates that he did not display any *needs* so patent as to make lay persons such as Officer Tucker, Captain Wrigley or Lieutenant Oulette remiss in failing to arrange for immediate medical attention.

■ The "seriousness" of an inmate's needs may also be determined by reference to the effect of the delay of treatment. *Monmouth County*, 834 F.2d at 347. Surveyed from this perspective, the insufficiency of Gaudreault's claim is thrown into even sharper relief. There is nothing in the record to suggest that Gaudreault's injuries were exacerbated in the slightest by the delay in providing treatment. In his many submissions to the district court, Gaudreault complained mightily about the dire consequences of his encounter with the

Salem police, going so far as to predict his imminent demise, but the medical evidence he produced in support of his complaints shows nothing of the kind. At most, the medical record suggests that Gaudreault suffered a "blow out fracture" of the right orbit, resulting in a deviated septum, a cyst in his sinus and some transient nerve damage (Report of Dr. Terry J. Garfinkle, June 14, 1985; Salem Hospital Radiology Report, May 1, 1985).[4] But even Dr. Garfinkle, writing almost two months after the incident, saw no need for immediate treatment: concerning the nerve damage, he appears to have counseled patience; with respect to Gaudreault's deviated septum, Dr. Garfinkle said only that surgical correction *would be* the preferred treatment *if* Gaudreault's symptoms became sufficiently severe. We therefore do not see, and Gaudreault has not shown us, how a ten-hour delay in treatment immediately following his injury could possibly have caused him harm.

### 4. *Municipal and Supervisory Liability*

■■■■ We need not linger over this claim. It is by now axiomatic that the doctrine of *respondeat superior* does not apply to claims under section 1983. *See Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir.1985). A municipality or its supervisory personnel can be held liable for the constitutional misconduct of its employees only on the basis of an "affirmative link" between their acts and those of the offending employee. *Id.* at 820. In order to establish municipal liability, the plaintiff must show that the acts or omissions of the municipality's policymakers evidence "deliberate indifference" to the rights of its inhabitants. *Canton v. Harris*, 489 U.S. 378, 387–90, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412, 426–27 (1989). Supervisors similarly can be held liable only on the basis of their own acts or omissions, amounting at the least to "reckless" or "callous" indifference to the constitutional

rights of others. *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989).

■■■ Gaudreault's complaint referred in the most general terms possible to a "failure to train" on the part of the municipality and its chief of police. As the magistrate noted, however, Gaudreault "has failed to set forth even a scintilla of evidence to show that the City of Salem, its officials, or the supervisory police failed to train the police officers and that this failure to train amounts to a deliberate indifference to constitutional rights." Summary judgment on this claim was manifestly appropriate.

*Affirmed.*

---

**4.** The medical records also show that Gaudreault came to suffer from some form of chronic meningitis in the years following his arrest, but they do *not* show that this condition resulted from any acts of the defendants. Rather, as Gaudreault's discharge notes from a 1987 stay in a veterans' hospital reflect, the etiology of his meningitis is "unknown."