Wilberto Pinela **COSTOSO,** et al., **Plaintiffs,**

v.

**UNITED STATES of America,** et al., **Defendants.**

**Civ. No. 92–2776 (JP).**

United States District Court, D. Puerto Rico.

March 29, 1995.

Luis Gonzalo de Jesús Rivera, Urb. Santa Rosa, Bayamón, PR, for plaintiffs.

Isabel Muñoz Acosta, Asst. U.S. Atty., Hato Rey, PR, for defendants.

### OPINION AND ORDER

PIERAS, District Judge.

Plaintiffs filed this Federal Torts Claims Act action for the alleged wrongful death of Wilfredo Pinela Guerra, who was shot by a Federal Bureau of Investigation ("FBI") agent after he committed an armed robbery. This is also an action for alleged violations of decedent's rights under the Fourth and Fifth Amendments of the United States Constitution, and the laws of Puerto Rico. The defendants, special agents Norman Smith and Greg Ahlers, deny any wrongdoing and assert that their actions were warranted in light of the armed robbery committed by the deceased. Defendants' motion for summary judgment (docket No. 36), and plaintiffs' opposition (docket No. 37), are now before the Court. For the reasons stated below, defendants' motion for summary judgment is hereby **GRANTED**.

### I. BACKGROUND

On the afternoon of February 26, 1991, while driving on Baldorioty de Castro avenue in front of the Luis Lloréns Torres Public Housing Project in Isla Verde, Puerto Rico, FBI special agents Greg Ahlers and Norman Smith observed the decedent, Wilfredo Pine-la Guerra, commit armed robbery of two persons in a taxi cab. The agents were returning from a surveillance detail in an FBI vehicle when, while stopped at a traffic light in front of the public housing project at about 4:25 p.m., they observed the robbery at gun point. The decedent then started to flee on foot with the passenger's purse. These facts are undisputed. Then, according to the agents, they confronted the decedent with their identity as law enforcement officers and, when the decedent responded by turning upon them with a black semi-automatic pistol in hand, special agent Smith fired one shot which struck the decedent and sent him to the ground.

The plaintiffs, however, disagree with the version of the facts provided by the agents. The plaintiffs claim that a witness at the scene did not see Pinela Guerra carrying a gun when the agents identified themselves and shot him. Therefore, plaintiffs claim that after the decedent dropped the gun, the agents shot him in the back. To support their version of the facts, the plaintiffs presented decedent's autopsy report, which states that the bullet entered through decedent's back and was lodged in the left side of his neck. The report also shows that the decedent was apparently a cocaine user, testing positive for cocaine metabolites in the "vitreous humour" test.

It is also undisputed that after the shooting, special agents Smith and Ahlers approached Wilfredo Pinela Guerra to observe his condition and secure his weapon. The weapon recovered was a plastic gun replica. Special agent Smith radioed the Puerto Rico Police, San Juan Division, and requested medical assistance. Puerto Rico Police agents arrived at the scene and transported decedent in a squad car to the Arnaldo García Rivera Diagnostic and Treatment Center located at the Lloréns Torres Public Housing Project. He was then transferred at 4:50 p.m. to the Puerto Rico Medical Center ("PRMC") in Río Piedras in order to receive appropriate medical treatment. Wilfredo Pinela Guerra arrived at PRMC at 5:20 p.m., where he was evaluated at 5:25 p.m. He received surgical and neuro surgical evaluations at both 6:25 p.m. and 11:00 p.m. respec-

tively. Between 7:00 p.m. and 8:00 p.m. the patient was taken to the operating room where he was found unstable and in respiratory distress. He was then sent to the Trauma Unit for stabilization before the operation could be performed. Back at the operating room at 11:25 p.m., he developed a cardio respiratory arrest and failed to respond to resuscitation. He was pronounced dead at 12:01 a.m., February 27, 1991.

On December 7, 1992, plaintiffs, the mother, father, sister, common-law wife, and daughter of the decedent, filed this Complaint alleging that decedent's death was caused by the negligence and excessive use of force by special agents Smith and Ahlers. On May 5, 1993, defendants filed a motion to dismiss (docket No. 7). Before the Court had an opportunity to rule on the motion, defendants filed a motion for summary judgment (docket No. 36). The motion for summary judgment, which is now before the Court, includes all arguments presented in the motion to dismiss.

## II.  THE RULE 56 STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment in a case where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988).

Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, there is not the slightest doubt as to whether a genuine issue of material fact exists. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987); *Peckham v. Ronrico Corp.*, 171 F.2d 653 (1st Cir.1948). A "genuine" issue is one that is dispositive, and which consequently must be decided at trial. *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989); *Anderson v. Liberty Lobby*, 477 U.S.

242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact, which is defined by the substantive law, is one which affects the outcome of the suit and which must be resolved before attending to related legal issues. *Mack*, 871 F.2d at 181.

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the non-movant to provide the Court, through the filing of supporting affidavits or otherwise, with "some indication that he can produce the quantum of evidence [necessary] to enable him to reach the jury with his claim." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975); *see also Brennan*, 888 F.2d at 191. The non-movant cannot rest upon mere allegations or denial of the pleadings. Fed. R.Civ.P. 56(e). Indeed, the non-movant must affirmatively show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514.

## III.  DISCUSSION

### A.  Reasonableness of the Use of Deadly Force

■ It is now settled that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirements of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). Therefore, before addressing any other issue presented by the defendants in support of their motion for summary judgment, it is necessary to determine whether the agents' decision to use deadly force in the arrest of Wilfredo Pinela Guerra was reasonable in light of the particular circumstances which led to his death. If

their actions were reasonable in accordance with the circumstances, decedent's constitutional rights were not violated and the defendants would be immune from civil liability. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Reasonableness is therefore the centerpiece of the Court's analysis.

In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court of the United States made explicit what had been stated implicitly in *Garner,* namely, that claims alleging "that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard' rather than under a 'substantive due process' approach." *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871. Moreover, *Graham* clarified the meaning of "reasonableness" under the Fourth Amendment. While recognizing that the test of reasonableness under the Fourth Amendment is not capable of precise definition, the Supreme Court explained that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872. Effectively, therefore, law enforcement officers enjoy a great amount of latitude in their decisions due to the nature of their jobs. A closer look of the above mentioned decisions is in order.

■ In *Garner,* a police officer shot and killed Garner in order to prevent his escape from the scene of the burglary, even though Garner did not appear to be armed. Garner, after being told to halt, tried to jump over a fence at night in the backyard of a house he was suspected of burglarizing. With the aid of a flashlight, the officer was able to see Garner's face and hands. Even though the officer saw no sign of a weapon, he shot Garner in order to prevent his escape. The officer argued that his actions were reasonable as a Tennessee state statute provided that a law enforcement officer could use any means necessary to effectuate an arrest. The Supreme Court held that under the Fourth Amendment the use of deadly force is reasonable only when it is necessary to prevent an escape and the officer has probable cause to believe that the suspect poses a substantial threat of death or serious physical injury to the officer or the public. *Garner,* 471 U.S. at 3, 105 S.Ct. at 1697. Furthermore, the Court explained that:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12, 105 S.Ct. at 1701. Therefore, if the suspect presents no immediate threat to the officer nor to others, the potential damage from failing to apprehend the suspect does not justify the use of deadly force. As a result, the Supreme Court held in *Garner* that the Tennessee statute was unconstitutional and that the use of deadly force by the officer was unreasonable under the Fourth Amendment as the unarmed suspect did not pose a threat to the officer or the public.

In *Graham,* a diabetic felt the onset of an insulin reaction and drove to a convenience store to purchase orange juice. Upon entering the store and seeing the number of people ahead of him at the checkout line, Graham hurried out of the store in order to go to a friend's house. A police officer became suspicious, followed the car and made an investigative stop. Backup police officers arrived on the scene, handcuffed Graham, and ignored Graham's attempts to explain and treat his diabetic condition. Graham sustained various physical injuries during the incident, was thrown headfirst into the police car, and the officers refused to let him have some orange juice as a remedy for his condition. Graham was later released when the officer learned that nothing happened at the

store. Graham brought an action against the officers involved in the incident, alleging they had used excessive force in making the investigatory stop, in violation of his rights under the Fourth Amendment. The district court entered a directed verdict in defendant's favor, and the court of appeals affirmed.

The Supreme Court reversed and remanded the case, explaining that the evaluation of reasonableness in Fourth Amendment claims must consider the quick decision-making police officers are forced to do when rendering their duties. *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872. Therefore, when evaluating whether the use of force by law enforcement officers is reasonable, wide latitude must be given to the officers' choice of action; specially if this choice has to be made under "tense and rapidly evolving" situations. *Id.* at 396–97, 109 S.Ct. at 1871–72. Since the lower courts applied the incorrect legal standard, the Supreme Court remanded the case in order for the court of appeals to consider the claim under the Fourth Amendment reasonableness standard.

Recently, the First Circuit Court of Appeals applied the reasonableness standard in an action against police officers who shot a man after he resisted arrest and threatened to use a knife against any policeman who approached him. In *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691 (1st Cir. 1994), two officers were sent to investigate a domestic violence report at Roy's home. When the officers tried to serve summons upon Roy, he threatened to use a knife against them. The officers drew their side arms and ordered Roy to put the knife down. After repeated warnings from the officers, Roy made a "kicking-lunging motion" toward the officers. One of the officers shot Roy twice, injuring him seriously. Roy eventually recovered, and brought a 42 U.S.C. § 1983 action against the officers and the City of Lewiston alleging that the officers had unreasonably used deadly force to arrest and subdue him. The district court granted sum-

mary judgment for the defendants, and the First Circuit Court of Appeals affirmed the decision, finding that the officers' reaction to Roy's threats were objectively reasonable. Analyzing the Supreme Court's decisions in *Garner* and *Graham*, the court of appeals explained that "the Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." *Roy*, 42 F.3d at 695. Furthermore, the Court explicitly found that "the Supreme Court intends to surround the police [officers] who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases." *Id.* Other circuits share a similar view. *See, e.g., Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203 (1st Cir.1990), cert. denied, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991), *Krueger v. Fuhr*, 991 F.2d 435 (8th Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993); *Reese v. Anderson*, 926 F.2d 494 (5th Cir.1991); *Ryder v. The City of Topeka*, 814 F.2d 1412 (10th Cir.1987).

■ In light of the standard established by the Supreme Court under the facts presented to this Court, the conclusion is inescapable that the agents' actions were reasonable. The agents witnessed the commission of a dangerous felony by an armed individual. Specifically, the agents saw the decedent thrust a weapon into his victim's face as he made threatening gestures. Therefore, the agents had probable cause to make an arrest and they had reason to consider the decedent extremely dangerous. Finally, when the agents identified themselves as law enforcement officers, and as stated in their sworn statements, the decedent turned to face the agents with the gun in his hand. Wilfredo Pinela Guerra represented a danger and a significant threat to the safety of the agents and the public as he ran away from the scene of the crime. The use of deadly force to apprehend the decedent was certainly reasonable.

■ During the Initial Scheduling Conference, held on July 6, 1994, plaintiffs claimed that they had a witness who would testify that she did not see the decedent carrying a

weapon when the agents shot him. However, unlike the defendants, plaintiffs have not submitted any affidavit or sworn statement to the Court in support of this claim. Other than plaintiffs' attorney naked assertions, no evidence has been submitted to the Court which would substantiate the existence of a genuine issue of material fact. As explained before, plaintiffs have an affirmative duty to show that sufficient evidence exists supporting an alleged factual dispute in order to require a jury or judge to resolve the issue at trial. Plaintiffs have failed to meet this burden as they have relied exclusively on the findings made in the autopsy report to support their claim of excessive use of force. This reliance on the autopsy report is misplaced because the fact that the bullet entered through decedent's back is of no material consequence for purposes of the motion for summary judgment. The Court will not speculate as to the various possible scenarios that would substantiate the autopsy report. It is sufficient to say that many factual scenarios exist which do not controvert defendants' allegations and that would explain why the bullet entered through decedent's back. Therefore, no genuine issue of material fact remains for the Court's consideration.

With the benefit of hindsight, it is certainly tragic that Wilfredo Pinela Guerra died after committing a robbery with a plastic gun replica. His family, and in particular his daughter, will certainly never fully recover from their tragic loss. However, it was Wilfredo Pinela Guerra's own decision to commit an armed robbery which served as the catalyst for the chain of events that resulted in his death. Maybe it was his use of cocaine (as evidenced by the autopsy report) which provoked him to commit the robbery. Again, however, speculation serves no purpose, and reality is hard to ignore. Wilfredo Pinela Guerra used what clearly appeared to be a gun to commit the robbery. He threatened to kill the taxi driver and his passenger unless they gave him money. He also threatened the lives of the agents by turning to face them with a weapon in his hand. For objectively reasonable law enforcement officers, Wilfredo Pinela Guerra represented a significant threat and danger to the public and to themselves. Therefore, the agents did not violate decedent's constitutional rights with their decision to use deadly force to apprehend him.

## B. Medical Attention Provided

■ The Due Process Clause of the Fifth Amendment requires the government or an appropriate government agency to provide medical care to persons "who have been injured while being apprehended by the police." *Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Based on this basic constitutional requirement, plaintiffs claim that the federal agents were negligent in failing to provide adequate medical attention for the decedent. Specifically, plaintiffs allege that once the decedent had been taken to the PRMC, the agents had a duty to oversee the treatment given by the doctors to Wilfredo Pinela Guerra. Since plaintiffs claim that Wilfredo Pinela Guerra did not receive proper and prompt attention while at the PRMC, they argue that the defendants had a responsibility to ensure that he was treated promptly and efficiently.

As the undisputed facts established, the two FBI agents requested medical attention for Wilfredo Pinela Guerra immediately after he was shot. He was then taken to PRMC where he died seven hours later. During the Initial Scheduling Conference held on July 6, 1994, the Court discussed with plaintiffs' attorney at length the specific theory under which he was trying to establish defendants' liability. Finding no sound theory under which defendants could be found liable for their failure to oversee the treatment provided to the decedent by the doctors at PRMC, the Court summarily dismissed the claim from plaintiffs' complaint. However, upon plaintiffs' attorney's request, the Court granted the plaintiffs until July 27, 1994, to file a memorandum clearly outlining their theory of liability based on their allegation of failure to provide adequate medical care. Plaintiffs failed to comply with the Court's Order and did not file any memorandum. Having had the opportunity once again to consider plaintiffs' claim, the Court finds that the agents provided the necessary and appropriate medical attention to the decedent by

calling for medical assistance. No more can be expected from law enforcement officers as they are not doctors. Law enforcement agents can not be held responsible for overseeing the care provided by doctors in a hospital. Therefore, the plaintiffs have not presented a colorable claim under the Fifth Amendment for failure to provide medical attention.

## IV. CONCLUSION

In light of the factual circumstances faced by both federal agents, the Court finds that the use of deadly force to apprehend the decedent was a reasonable seizure consistent with the guarantees of the Fourth Amendment. Furthermore, the Court finds that the agents, in accordance with the Fifth Amendment, provided prompt and appropriate medical care to the decedent by summoning for medical care after the shooting. Therefore, defendants' motion for summary judgment is hereby **GRANTED.**

Any other pending motion not in accordance with this Opinion and Order is hereby **DENIED.**

IT IS SO ORDERED.