Agnes, Peter W., J.
The Plaintiff, Abdullah Malik (“Plaintiff’), an inmate of Old Colony Correctional Center, filed this claim against defendants UMass Correction Health & others (“Defendants”) alleging deliberate indifference to his medical needs, in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution, Article 26 of the Massachusetts Declaration of Rights, Title II of The Americans with Disabilities Act, M.G.L.c. 127, §16, §17, and §32, and M.G.L.c. 12, §11H and §111. The plaintiff seeks declaratory relief, injunctive relief, compensatory and punitive damages and costs pursuant to 42 U.S.C. §1983. The defendants now move for summary judgment.

BACKGROUND

The following facts are drawn from the record and do not appear to be in dispute. The plaintiff suffers from Degenerative Joint Disease which has led to joint pain in his hip, knees, and feet. In July 2003, the plaintiff reported that during a routine shake-down, the Department of Corrections (DOC) confiscated his knee brace made for him by the Lemuel Shattuck Hospital. In September 2003, Dr. John M. Harris diagnosed the plaintiff with planovalgus, a condition in which the arch of the foot is flattened and everted.[2] During this visit, Dr. Harris indicated that the plaintiff needed new sneakers and inserts, and noted that he planned to mold sneaker inserts and order 6-inch quarter boots. On November 20, 2003 Dr. Harris diagnosed the plaintiff with osteoarthritis of the left knee, and developed a plan to fit him with a left knee brace.[3] The plaintiff received the boots and orthotics on Dec. 18, 2003, but claims that the DOC later confiscated his boots because they contained a metal shank. In August 2005, a podiatrist examined the plaintiff and recommended additional padding in his footwear. Defendant Ms. Riendeau denied the extra padding in February 2006 stating that the sneaker or boots available in the canteen were adequate. On February 7,2006 defendant, Ms. Riendeau, noted that the plaintiff did not need a knee brace, and canceled the order.
The plaintiff also complains of severe hip pain. A CT scan of the hip in 2003 showed osteoarthritis with subchondral cyst formation[4] and sclerosis.[5] In 2004, a doctor recommended BenGay and heat treatment to alleviate the pain, but the defendants reported that BenGay was not available. In July 2004, the plaintiff reported that he was taking Vioxx for pain, and requested cortisone injections, which the defendants subsequently denied. In early 2006 the plaintiff started taking Celebrex, but changed to a regimen of Elavil and Non-steroidal Anti-inflammatory Drugs (NSAIDs), because he found the Celebrex ineffective. In May 2006 the plaintiff had an MRI of his hip and Dr. Rafael Altieri reported that the images were compatible with advanced right hip osteoarthritis, and were possibly due to report avascular necrosis (AVN).[6] In August 2006, Dr. George Whitelaw diagnosed the plaintiff with significant degenerative arthritis of the hip and recommended hip replacement surgery.
The plaintiff was diagnosed with Hepatitis C in April 1997 and Hepatitis A and B in June 1999. As of July 2000, the plaintiffs liver function tests were not sufficiently elevated so as to qualify him for treatment. The plaintiff underwent a liver biopsy on December 21, 2005 and the results confirmed the diagnosis of Hepatitis C. On April 28, 2006 the plaintiff registered for pegylated interferon treatment to treat Hepatitis C, but required an optometry and psychiatric evaluation before he could start treatment.[7] The optometry and psychiatric evaluations revealed no contraindications to Hepatitis C treatment. In June 2006 the plaintiff received an education regarding his Hepatitis C and a UMCH staff member contacted the UMass Medical School’s health coordinator regarding the length of the wait. The plaintiffs statement at oral argument that he has not yet started this treatment is not contradicted by anything in the record before me.

DISCUSSION

1. Summary Judgment Standard

Summary judgment is appropriate “when there is no genuine issue as to any material fact and [where] the moving party is entitled to judgment as a matter of law.” Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983) .The court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Under Rule 56, the moving party has the burden of providing sufficient evidence through pleadings, depositions, affidavits, interrogatories, and admissions to show the absence of a genuine issue of material fact. Mass.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Peterson v. Time, Inc., 404 Mass. 14, 17 (1989). Summary judgment is appropriate only when the moving party has established the absence of a triable issue of fact, and the court must deny summary judgment when the non-moving party has “set forth specific facts which establish there is a genuine issue for trial.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 741 (1991).

2. Nationwide Healthcare Crisis in Prisons

Studies in recent years on the demographics of prisons have revealed that the elderly and infirm *103 inmate population is growing at unprecedented rates, and increasing the costs of correctional health care providers with it.[8] A 2006 Inmate Statistic Report by the Massachusetts DOC revealed that from 1997 to 2006 inmates age forty to sixty-four years old have increased 29% with a corresponding increase of 14% as a proportion of the total inmate population.[9] Even more alarming, inmates over the age of sixty-five have increased 99% from 1997 to 2006.[10] With a recent Department of Justice study reporting that over one third of jail inmates nation wide have medical problems, this dilemma of a growing population of aging and sick inmates will become worse in the future.[11] As one commentator has observed:
In fiscal year 2001, it cost $29.5 billion to operate state prisons, an increase of $5.5 billion from 1996. Twelve percent, or $3.3 billion, of state operating expenditures were for prison medical care. That averages out to $2,625 per inmate in a year as compared with $4,370 average individual health care expenditures by U.S. residents. In 2001, five states spent above $4,000 per inmate (Alaska, California, Maine, Massachusetts, and New Mexico) whereas three states spent below $1,000 per inmate (Kentucky, Louisiana, and Montana). See James J. Stephan, Bureau of Justice statistics, Special Report: State Prison Expenditures, 2001, at 1-6 (June 2004), available at http://www.ojp.usdoj.gOv/bjs/pub/pdf/spe01.p df Cost concerns have driven the privatization of prison medical care. Criticized as a race to the bottom that privileges reducing costs over quality of care, in 2003 private medical companies ran prison health care in ten states and ran particular facilities in another seventeen states.[12]
This court is mindful that state and local governments are struggling to find the resources to meet the most basic needs of the Commonwealth’s residents, particularly in the area of health care. However, bearing in mind that 95% of all persons who are incarcerated will be released,[13] and return to our communities, it is shortsighted (and indeed unlawful) to design public policies to address the health needs of persons living independently in the community without simultaneously meeting the health needs of those who are incarcerated. See West v. Atkins, 487 U.S. 42, 54 (1988) (Prisons have “a constitutional obligation ... to provide adequate medical care to those whom it has incarcerated”).
3. Eighth Amendment and Article 26 Claims
The defendants contend that the plaintiff cannot as a matter of law demonstrate a violation of the Eighth Amendment. In order to bring a valid claim alleging that inadequate medical care constitutes a violation of the Eighth Amendment, “a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.” Estelle v. Gamble, 429 U.S. 97, 106 (1976). Under this standard, a prisoner must first establish that he or she has a serious medical need that is not being addressed, and demonstrate ill effects as a result of the deprivation of treatment. Id. The standard is an objective one. See Wilson v. Setter, 501 U.S. 294, 298 (1991). See also Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990); Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987). “A medical need is ‘serious’ if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor’s attention.” Gaudreault, 923 F.2d at 208. The seriousness of an inmate’s medical condition “may also be determined by reference to the effect of the delay of treatment.” Id.[14]
Secondly, a prisoner must demonstrate that prison officials acted with deliberate indifference in not providing adequate medical care. Far more than mere negligence must be proved. See Farmer v. Brennan, 511 U.S. 825, 835 (1994). “[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Id. at 837-38. In Farmer, supra, the Supreme Court stated that the requisite state of mind for proof of deliberate indifference is the criminal recklessness standard of conscious disregard for a substantial risk of harm. Situations in which a prisoner has received some treatment and disagrees with the adequacy or course of treatment, and disagreements involving medical judgment are not enough to allege a constitutional violation. See Sprull v. Gills, 373 F.3d 218, 235 (3rd Cir. 2004); Ferranti v. Moran, 618 F.2d 888, 891 (1980).
The plaintiff alleges that the defendant’s failure to provide him with orthotic devices, a hip replacement, and pegylated interferon treatment for Hepatitis C constitutes a violation of the Eighth Amendment. More specifically, the plaintiff claims that his degenerative joint condition and Hepatitis C are serious medical conditions, and that the delay and denial of treatment on the part of the defendants rises to the level of deliberate indifference. The record sets forth in great detail the plaintiffs medical history, and the parties do not appear to dispute the fact that doctors have prescribed footwear, a knee brace, a hip replacement, and pegylated interferon treatment for him. In addition, the record shows that the defendants denied the plaintiff of the prescribed knee brace and shoe inserts, and that the plaintiff has yet to receive the pegylated interferon therapy or treatment for his hip condition. Having all been diagnosed by physicians as mandating treatment, the plaintiffs health problems meet the threshold requirement for qualifying as serious medi *104 cal needs under the standard set forth in Estelle. Because the denial or delay of treatment for these conditions could result in serious harm and the consequences of the denial and delay are unknown at this time, a genuine issue of material fact exists for trial.
Similarly, an issue of triable fact exists as to whether prison officials acted with deliberate indifference in failing to provide the plaintiff with adequate or timely medical treatment. While proving deliberate indifference is a high burden to bear, the case law indicates that extreme forms of neglect or denial of prescribed medical care is sufficient to demonstrate the requisite state of mind. DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991). If medical professionals acknowledge that someone is an appropriate candidate for therapeutic treatment (for instance pegylated interferon) and over one year has passed without the patient receiving it, it is not consistent with the deliberate indifference standard for the health service to allow the patient to languish without any indication as to when the treatment will commence. See Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 336-37 (3d Cir. 1987) (noting that the denial of medical care on the basis of “non-medical reasons,” such as financial considerations, may constitute deliberate indifference). See also Anderson v. Swift, 2005 Mass.Super.LEXIS 472 (Mass.Super.Ct. 2005) (in an Eighth Amendment claim brought by a prisoner alleging inadequate medical care, this court denied the defendants’ motion for summary judgment when almost ten years had elapsed before the plaintiff underwent a necessary liver biopsy for the purpose of diagnosing Hepatitis C). Additionally, the defendants have without reason deprived the plaintiff of orthotic and footwear devices, years after a specialist prescribed them. As in Anderson, in this situation there is no evidence of treatment since the date of prescription and “it is possible that the delay in treatment exacerbated [the plaintiffs] illness.” Id. at 13. As such, the absence of an explanation for these denials and delays in prescribed treatment raises genuine issues of material fact for trial, and therefore summary judgment must be denied.[15], [16]

ORDER

For the above reasons, the defendant’s Motion for Summary Judgment is DENIED.

Planovalgus-Definition, http://www.biology-onl-ine. org/dictionary/Planovalgus (last visited Aug. 15, 2007).

Osteoarthritis is a non-inflammatoiy degenerative joint disease characterized by a breakdown of cartilage and enlargement of the bone at the margins. Osteoarthritis-Definition, http://www.biologyonline.org/dictionary/Osteoartirtis (last visited Aug. 15, 2007).

A subchondral cyst is a sac of fluid present in the bone beneath cartilage. Cyst-Definition, http://columbia.the-freedictionary.com/subchondral+cyst (last visited Aug. 15, 2007); Subchondral-Definition, http://biology-onl-ine. org/dictionaiy/Subchondral (last visited Aug. 15, 2007).

Sclerosis is a thickening or hardening of part of the body. Sclerosis-Definition, http://education.yahoo.com/reference/dictionary/entry/sclerosis (last visited Aug. 15, 2007).

AVN is a disease resulting from the temporary or permanent loss of blood flow to the bone. It causes the bone tissue to die and eventually collapse. Avascular Necrosis-Definition, http://healthlink.mcw.edu/article/926046182.html, (last visited Aug. 15, 2007).

PegyIated interferon is a molecule consisting of a substance called polyethylene glycol (also known as PEG) attached to a molecule of the protein interferon. PEG serves as a protective barrier around the interferon, which assists cells of the body in fighting the Hepatitis C virus. See http: / /www. pegasys. com/about-pegasys /pegasys-interfer on.aspx/ (last visited August 15, 2007).

LETTER FROM SCOTT HARSHBARGER, CHAIR, DEPARTMENT OF CORRECTION ADVISORY COUNCIL TO EDWARD A. FLYNN, SECRETARY, EXECUTIVE OFFICE OF PUBLIC SAFETY (OCT. 25, 2005).

MASSACHUSETTS DEPARTMENT OF CORRECTION, RESEARCH AND PLANNING DIVISION, JANUARY 1, 2006 INMATE STATISTICS (2006), http://www.mass.gov.Eeops/ docs/doc/research_reports/112006.pdf (last visited Aug. 14, 2007).

Id.

 LAURA M. MARUSCHAK, BUREAU OF JUSTICE STATISTICS, MEDICAL PROBLEMS OF JAIL INMATES (2006), http://www.ojp.usdoj.gov/bjs/ pub/pdf/mpji.pdf (last visited Aug. 14, 2007).

Andrew Brunsden, Hepatitis C in Prison: Evolving Toward Decency Through Adequate Care & Public Health Reform, 54 U.C.L.A. L. Rev. 465, 468 n.16 (2006).

See Timothy Hughes & Doris James Wilson, Bureau of Justice Statistics, Reentry Trends in the United States (Aug. 20, 2003), http://www.ojp.usdoj.gov/bjs/reentry/reen-try.htm.

See Hepatitis C in Prison, supra, 54 UCLA L. Rev. at 436 n. 135 (“In medical-care cases, lower courts have found that a medical need is serious when it is (1) diagnosed by a physician as requiring treatment; (2) one that is so obvious that even a layperson would easily recognize the necessity for doctor’s attention; and, more broadly, (3) if the condition may result in a life-long handicap or permanent injury. See generally Michael B. Mushlin, Rights of Prisoners 376-77 (3d ed., 2002)”).

The standard of review for violations of Article 26 in the context of inadequate medical care for prisoners is similar to the Eighth Amendment standard. A prisoner seeking relief under this provision must demonstrate (1) a condition or situation which poses a substantial risk of serious harm and (2) that a prison official had knowledge of the situation and ignored it. Torres v. Commissioner of Correction, 427 Mass. 611, 616 (1998) (citations omitted). For the reasons mentioned above, summary judgment is denied on the Article 26 claim.

The plaintiff alleged numerous violation of state and federal law in his COMPLAINT; however, at oral argument the plaintiff conceded that his complaint could be reduced to a claim of deliberate indifference under the Eighth Amendment and Article 26.