KAYATTA, Circuit Judge,
dissenting.
Reading the majority’s lengthy and oft-revisited discussion of the applicable standard of review, one would think that this *114 case posed issues of law or application of law to fact. This is plainly not so.
There is not a comma, much less a word, of the applicable law that the district court did not expressly and correctly explain and apply. All the parties and all the judges in this case, including the trial judge, agree on the controlling' principles of law, long ago established by the Supreme Court. See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); see also United States v. DeCologero, 821 F.2d 39, 43 (1st Cir.1987). Under that law, a prison must supply medical care to its prisoners “at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.” DeCologero, 821 F.2d at 43. The failure to provide such care, moreover, does not constitute an Eighth Amendment violation unless it rises to the level of “deliberate indifference” to a “serious medical need.” “Deliberate indifference” means that the prison official “knows of and disregards an excessive risk to inmate health or safety.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. A “serious medical need” is defined as, among other things, “one that has been diagnosed by a physician as mandating treatment.” Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990).
Our decision in this case therefore necessarily turns on the facts themselves. And we begin our review knowing that Kosilek does indeed have a serious medical need, and the prison’s own doctors, as well as the specialists retained by those doctors, informed DOC that treatment of Ko-silek’s medical condition in accordance with prudent professional standards requires sex reassignment surgery (SRS).[34] That leaves only two factual questions: (1) Are the DOC’s doctors correct that SRS is the only treatment for Kosilek’s condition that is commensurate with modern medical science as practiced by prudent professionals;[35] and, if so, (2) Did prison officials nevertheless deny that treatment not because they disbelieved their own doctors, and not because of prison security considerations, but rather simply because they feared public ridicule. If the answer to each of these two questions is “yes,” Kosi-lek should win. Otherwise, she loses.
Were I the trial judge charged with answering these two factual questions based solely on the written record, I would likely find against Kosilek on the first question for the reasons stated by the trial court’s appointed independent expert, Dr. Levine. In a nutshell, Dr. Levine, who participated in drafting the Standards of Care, provided carefully nuanced and persuasive testimony that medical science has not reached a wide, scientifically driven consensus mandating SRS as the only acceptable treatment for an incarcerated individual with gender dysphoria. But I am not the trial judge in this case. Nor are my colleagues. And that is the rub.
The experienced jurist who was the trial judge in this case, and who actually sat and listened to the live testimony, found as a matter of fact that:
(1) Commensurate with modern medical science, no prudent professional would rec *115 ommend any treatment for Kosilek other than SRS; and
(2) Prison officials nevertheless denied the treatment not because they rejected the accuracy of the medical advice tendered by their own doctors, and not because of security issues, but rather because they feared public ridicule. Their reasons for denying the necessary treatment were thus in bad faith.
The majority never explains why these two findings are not pure findings of fact, and are not therefore subject solely to review for clear error. Nor can it. After all, we are talking about, first, what the medical — not legal — standard of care is for a particular affliction, and second, whether Dennehy and Clarke were truthful in describing their security objections, such as their claim that they feared that Kosilek, after trying to get this surgery for twenty years, would escape on the way to the operating room or, fresh from the surgeon’s knife, overpower her guards and run away. Let me be plain on this point: Until today, there was absolutely no precedent (and the majority cites none) for reviewing such quintessentially factual findings under anything other than the clear error test.
As Judge Thompson carefully explains, there is a considerable amount of evidence that directly supports the trial court’s findings on these two points, depending on which witnesses one believes. I write separately only to stress that even if one agrees with the majority that the district court got the fact-finding wrong, we should defer unless the result is clearly erroneous. Of course, deferring to the trial judge’s fact-finding happens to produce a result in this case that some of us find surprising, and much of the public likely finds shocking. Scientific knowledge advances quickly and without regard to, settled norms and arrangements. It sometimes draws in its wake a reluctant community, unnerved by notions that challenge our views of who we- are and how we fit in the universe. The notion that hardwired aspects of gender may not unerringly and inexorably correspond to physical anatomy is especially unnerving for many.
The solution, I think, is to trust our trial judges to resolve these factual issues when the evidence supports a finding either way. Some will get it wrong; most will get it right. The arc of decision-making, over, time, will bend towards the latter. For each instance of error in fact-finding, such as possibly this case itself, $25,000 or so may be lost. But doctors and lawyers will réfine their presentations and other trial judges will make their own findings, not bound in any way by the fact-finding in this case.
Instead, by deciding the facts in this ease as an appellate court essentially finding law, the majority ends any search for the truth through continued examination of the medical evidence by the trial courts. It locks in an answer that binds all trial courts in the circuit: no prison may be required to provide SRS to a prisoner who suffers from gender dysphoria as long as a prison official calls up Ms. Osborne or Dr. Schmidt.[36] Acknowledging that the majority may well be correct on the facts, I nevertheless decline the invitation to join the majority in embracing the authority to decide the facts. I suspect that our court will devote some effort in the coming years to distinguishing this case, and eventually reducing it to a one-off reserved only for transgender prisoners.

. None of these witnesses face challenge on the grounds that their opinions are outside the bounds of accepted science. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. In the majority’s words, "whether SRS is a medically necessary component of Kosilek’s care, such that any course of treatment not including surgery is constitutionally inadequate." Op. at 86.

. No prisoner is likely to have a more favorable record than Kosilek.