# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2014

Lyle W. Cayce
Clerk

No. 13-10545

DENISE KITCHEN, Individually and as Representative of the Estate of Gregory Maurice Kitchen, Deceased,

Plaintiff - Appellant

v.

DALLAS COUNTY, TEXAS; UNKNOWN DALLAS COUNTY CORRECTIONAL OFFICERS; ANTHONY BENSON, Dallas County Detention Officer; DAVID GARRETT, Dallas County Detention Officer; GREGORY MYERS, Dallas County Detention Officer; DAVID ROBERTS, Dallas County Detention Officer; RENE GUZMAN, Dallas County Detention Officer; TA'MON HAGGERTY, Dallas County Detention Officer; OLLIE POLK, JR., Dallas County Detention Officer; JEREE HALL, Dallas County Detention Officer; MARQUITA GRAY, Dallas County Detention Officer; JEREMIAH MOSLEY, Dallas County Detention Officer,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, ELROD, and COSTA, Circuit Judges.*

W. EUGENE DAVIS, Circuit Judge:

Plaintiff-Appellant, the widow of Gregory Maurice Kitchen ("the deceased"), brings several constitutional claims under 42 U.S.C. § 1983 against Defendants-Appellees.   First, Plaintiff-Appellant claims that individual

---

* Judge Costa participated by designation in the oral argument of this case as a United States District Judge for the Southern District of Texas.  Since that time he has been appointed as a Fifth Circuit Judge.

No. 13-10545

Defendants-Appellees used excessive force against the deceased to extract him from his jail cell while in pretrial detention at Dallas County Jail, which resulted in the deceased's asphyxiation and death.  Second, Plaintiff-Appellant claims that Defendants-Appellees acted with deliberate indifference to the deceased's medical needs by failing to contact Dallas County Jail's medical personnel prior to extracting the deceased from his jail cell.  As to both of these claims, Plaintiff-Appellant argues that the nine detention officers[1] named as Defendants-Appellees are each liable in their individual capacities despite their eligibility for qualified immunity.  Importantly, some of the nine detention officers may be liable solely under the alternative theory of bystander liability, according to Plaintiff-Appellant, as described in our decision in *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  Finally, Plaintiff-Appellant also argues that Defendant-Appellee Dallas County is liable as a municipality under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978), for failing to provide adequate training to the detention officers.

In the present appeal, Plaintiff-Appellant challenges the district court's order of April 24, 2013, which granted Defendants-Appellees' motion for summary judgment as to all of Plaintiff-Appellant's claims.  In that order, the district court concluded that the record contained insufficient evidence to create a genuine issue of material fact relating to Plaintiff-Appellant's claims for either excessive force or deliberate indifference to the deceased's medical needs.  The district court therefore had no reason to address Plaintiff-Appellant's arguments regarding the individual detention officers' bystander liability under *Hale*, 45 F.3d at 919.  The district court also explicitly refrained

---

[1] Although the caption of this case does not reflect the change, Plaintiff-Appellant voluntarily dismissed Sgt. David Roberts from this case on February 20, 2013, after determining that Sgt. David Roberts was not present during the events relevant to this case.

2

from addressing either the individual detention officers' entitlement to qualified immunity or Defendant-Appellee Dallas County's liability under *Monell*, 436 U.S. at 694.

We now reverse and remand in part, and affirm in part. For the reasons set forth below, the record does indeed present genuine issues of material fact from which a jury could conclude that excessive force was used against the deceased. On remand, therefore, the district court must consider in the first instance whether any or all of the individual Defendants-Appellees may proceed to trial on a theory of direct liability for use of force or, in the alternative, on a theory of bystander liability. The district court should also consider in the first instance whether the individual Defendants-Appellees are entitled to qualified immunity.

As to Plaintiff-Appellant's claim against the individual Defendants-Appellees for deliberate indifference to the deceased's medical needs, however, we conclude that the district court's analysis was correct. As explained below in greater detail, we affirm the district court's grant of summary judgment on this claim.

Finally, we affirm summary judgment as to Defendant-Appellee Dallas County's municipal liability for failing to provide adequate training to the detention officers. Plaintiff-Appellant has neither demonstrated a pattern of constitutional violations similar to those at issue in this case, nor demonstrated that this single incident of injury was highly predictable and patently obvious. Plaintiff-Appellant's arguments as to this claim must therefore be rejected.

I.

All of the events relevant to this case took place in January 2010, while the deceased was in pretrial detention at Dallas County Jail. With a few critical exceptions, most of the facts are not in dispute. Because the deceased

had been observed "digging through other detainees' personal property," as well as "mumbling, walking backwards, and avoiding eye contact with others," the deceased was placed in the facility's West Tower for psychiatric evaluation. During interviews with medical staff in the West Tower, the deceased urinated on himself, cried, stated that he could hear his mother's voice, and admitted to having suicidal thoughts.

Just before midnight on January 21, 2010, the deceased was observed pacing around his jail cell and hitting his head on the cell door and walls. A detention officer sent the deceased to a nursing station for evaluation. Shortly after midnight, the deceased "broke free from the guards, started screaming, and grabbed one of the nurses" before two detention officers "subdued [him] . . . and placed him in a restraint chair where he remained from 12:25 a.m. until at least 5:15 a.m." Out of concern that "he was going to assault the medical staff," who are based mostly in the West Tower, a supervisor transferred the deceased to the North Tower.

The deceased was placed in a cell in the North Tower near to the cell of an inmate named Etheridge. Both had been designated as suicidal. In the afternoon on January 22, 2010, Etheridge attempted suicide by cutting himself, which brought several of the detention officers on duty into Etheridge's cell in an effort to save Etheridge's life.

While the detention officers were attending to Etheridge, the deceased began to scream obscenities and cry out for his mother. According to the detention officers, the deceased also resumed banging his head against the bars. One of the detention officers, Defendant-Appellee Guzman, left Etheridge's jail cell, told the deceased to stop banging his head, and then returned to attend to Etheridge. The deceased briefly stopped, according to the detention officers, but then resumed. A second detention officer, Defendant-Appellee Myers, told the deceased at this time that they would call

4

the medical staff.  Defendant-Appellee Guzman also again instructed the deceased "to have a seat," after which the deceased showed the detention officers his middle finger and urinated on the floor.

At this point, Defendants-Appellees Guzman and Myers attempted to extract the deceased from his cell and return him to a restraint chair.  They were assisted by the other individual detention officers named in this lawsuit, all of whom had been present in the North Tower and near the deceased's cell at the time.  The detention officers spent "seven to eight minutes" talking to the deceased, during which time the deceased "was not banging his head against anything or otherwise causing harm to himself."  No attempt was yet made by the detention officers to summon the medical staff.

Defendant-Appellee Guzman then entered the cell, after which a violent altercation began.  As Defendant-Appellee Guzman explained during his deposition, the deceased "turned around abruptly and raised his hands," after which Defendant-Appellee Guzman then performed a "neck controlled take down" on the deceased, which physically brought the deceased down onto the floor.  Using pepper spray, the detention officers subdued the deceased and moved him out of the cell onto the floor of the hallway.  The deceased was then restrained in cuffs and leg-irons.

The record contains affidavits by four inmates: John Adams, Morris Simons, Joseph Daniels, and Jason Barcellever.  According to a fair reading of these four affidavits, the detention officers kicked, choked, and stomped on the deceased even after he had already been restrained.  The inmates also assert in their affidavits that the detention officers used pepper spray on the deceased multiple times after he had stopped resisting.  While Defendants-Appellees dispute the factual content of the inmates' affidavits, they do not challenge

these affidavits' status as competent evidence on summary judgment.[2]

While still lying on the floor shortly after being restrained, the deceased became unresponsive, stopped breathing, and died. According to the autopsy report, the death was a homicide caused by "complications of physical restraint including mechanical asphyxia" due to "neck restraint during struggle" and the fact that "one officer was kneeling on the decedent's back during restraint." Other factors included "physiologic stress," "[m]orbid obesity and cardiomegaly," and exposure to "oleoresin capsicum," which was one of the chemicals in the pepper spray.

Less than nine months later, on September 10, 2010, Plaintiff-Appellant filed her complaint in the district court alleging constitutional violations under 42 U.S.C. § 1983. On December 31, 2012, Defendants-Appellees filed their motion for summary judgment, which the district court granted in its entirety on April 24, 2013. The district court ruled directly on the merits of Plaintiff-Appellant's claims for excessive force and deliberate indifference to the deceased's medical needs, concluding that neither claim could be sustained based on the evidence in the record.

The district court therefore declined to discuss any aspect of the parties' arguments regarding bystander liability. The district court also explicitly refrained from making any ruling on the parties' arguments regarding qualified immunity or municipal liability. In a footnote, the district court stated as follows: "Finding no underlying constitutional violation under either an excessive force theory or an inadequate medical care theory, any analysis of qualified immunity or municipal liability is unnecessary at this time."

---

[2] During oral argument before this court, counsel for Defendants-Appellees confirmed that no objection was ever made to these affidavits during proceedings before the district court. Accordingly, these affidavits are eligible for this court's consideration on appeal. *See BGHA, LLC v. City of Universal City, Tex.*, 340 F.3d 295, 299 (5th Cir. 2003); *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 650 n.3 (5th Cir. 1992).

No. 13-10545

II.

The grant or denial of a motion for summary judgment is reviewed de novo.[3]  Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the record demonstrates no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.[4] When considering a motion for summary judgment, both this court and the district court construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.[5]

In claims brought under 42 U.S.C. § 1983, "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[6]  Accordingly, when a defendant invokes the defense of qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.[7]  Because qualified immunity constitutes an immunity from suit rather than a mere defense to liability, adjudication of a defendant's entitlement to qualified immunity "should occur 'at the earliest possible stage in litigation.'"[8]  The two-part inquiry into qualified immunity is first "whether a constitutional right would have been violated on the facts alleged," and second "whether the right was clearly established" at the time of violation.[9] Courts are "permitted to exercise their sound discretion in deciding which of

---

[3] *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999).

[4] *Deville*, 567 F.3d at 163-64; *Burge*, 187 F.3d at 464-65.

[5] *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004).

[6] *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[7] *See Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001).

[8] *McClendon*, 305 F.3d at 323 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

[9] *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

No. 13-10545

the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[10]

No liability exists under the doctrine of *respondeat superior* in claims brought under 42 U.S.C. § 1983.[11] Accordingly, for a municipality to be liable for the actions of its employees under *Monell*, 436 U.S. at 694, the plaintiff must show that the municipality had adopted a policy, practice, or custom that was the moving force behind the constitutional violation.[12]

## III.

We first consider the district court's treatment of Plaintiff-Appellant's claim against Defendants-Appellees for use of excessive force. As we held in *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc), "[t]he constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment."[13] However, where a pretrial detainee is allegedly the victim of a detention officer's use of excessive force, as explained in *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993),[14] such a claim is subject to the same analysis as a convicted prisoner's claim for use of excessive force under the Eighth Amendment. Accordingly, as set forth in *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)), a constitutional violation occurs where a detention officer uses force "'maliciously and sadistically for the very purpose of causing harm'" to the pretrial detainee,

---

[10] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[11] *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752-53 (5th Cir. 2009).

[12] *Duvall v. Dall. Cnty., Tex.*, 631 F.3d 203, 209 (5th Cir. 2011).

[13] *See also Edwards v. Loggins*, 476 F. App'x 325, 326-27 (5th Cir. 2012).

[14] *See United States v. Daniels*, 281 F.3d 168, 179 (5th Cir. 2002) ("[A] claim of excessive force by a law enforcement officer is correctly examined under the same standard regardless whether the claim arises under the Eighth Amendment or the Fourteenth Amendment."); *see also Edwards*, 476 F. App'x at 326-27; *Mitchell v. Cervantes*, 453 F. App'x 475, 477 (5th Cir. 2011); *Noel v. Webre*, 426 F. App'x 247, 249-50 (5th Cir. 2011).

No. 13-10545

rather than in "'a good faith effort to maintain or restore discipline.'"[15]

## A.

As the district court correctly observed, the Supreme Court's decision in *Hudson*, 503 U.S. at 7, instructs courts to consider a number of factors when evaluating an excessive force claim. These factors include "the extent of injury suffered," "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'"[16] Contrary to the district court's conclusion, however, we find that the affidavits submitted by the deceased's fellow inmates do create a genuine dispute as to material facts regarding the second, third, fourth, and fifth *Hudson* factors in the present case.

Fairly read, the four inmates' affidavits assert that the detention officers kicked, choked, and stomped on the deceased even after he was already restrained, subdued, and no longer a threat. Although the detention officers have denied taking such actions in their deposition testimony, the respective credibility of the inmates and detention officers may not be evaluated on summary judgment.[17] It is sufficient that a reasonable jury could believe, based on these inmates' potential testimony at trial, that the detention officers' actions were motivated by a purpose to cause harm.[18] With respect to the factors set forth in *Hudson*, 503 U.S. at 7, "the need for application of force" would be greatly reduced after the deceased had already been restrained and

---

[15] *See Daniels*, 281 F.3d at 179-80 n.10; *Valencia*, 981 F.2d at 1446; *see also Mitchell*, 453 F. App'x at 477; *Noel*, 426 F. App'x at 249-50.

[16] *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321); *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999).

[17] *See Willis v. Cleco Corp.*, 749 F.3d 314, 325 (5th Cir. 2014); *MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 972 (5th Cir. 2014).

[18] *See Hudson*, 503 U.S. at 6 (citing *Whitley*, 475 U.S. at 320-21); *Daniels*, 281 F.3d at 179-80 n.10.

9

subdued, such that the "amount of force" described in the affidavits may have been disproportionate to the need. Additionally, even if the detention officers did possess an actual perception that the deceased posed a threat after he had already been restrained and subdued, a jury might nonetheless conclude that such a perception was unreasonable.[19] Finally, a jury might also conclude that the detention officers failed "'to temper the severity of [their] forceful response'" sufficiently, given that the detention officers' response allegedly involved kicking, choking, and stomping.[20]

Accordingly, based on the four inmates' affidavits, genuine disputes remain as to material facts relating to both the timing and the degree of force used. These genuine disputes affect a legal analysis of four of the five factors set forth in *Hudson*, 503 U.S. at 7. The district court erred, therefore, when it granted the individual Defendants-Appellees' motion for summary judgment in its entirety.

Several matters remain, therefore, for the district court to address on remand. First, because of its erroneous conclusion as to the Defendants-Appellees' conduct as a whole, the district court performed no summary judgment analysis of the Defendants-Appellees' individual conduct to determine which of them could individually be held liable for the use of excessive force. On remand, the district court must perform such analysis. In this context, we note the observation by counsel for Plaintiff-Appellant during oral argument that the deceased's fellow inmates were never deposed due to a limit imposed by the district court on the number of permitted depositions, despite the central importance of the inmates' potential testimony. Additionally, the inmates' affidavits mention only Defendants-Appellees

---

[19] *See Hudson*, 503 U.S. at 7.
[20] *See id.* (quoting *Whitley*, 475 U.S. at 321).

No. 13-10545

Guzman, Mosley, Myers, Garrett, Haggerty, and "2 Female Officers." Even these officers' actions are described in very general terms, and the remaining detention officers' actions are not described at all in the affidavits. Rules 26 and 30 of the Federal Rules of Civil Procedure vest the district court with broad discretion to tailor discovery and permit or limit depositions as it chooses.[21] The need for "additional discovery" remains "an issue [that] the district court can consider on remand" in its discretion.[22]

Second, the district court must also "examine[] the actions of defendants individually in the qualified immunity context" under *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007).[23] The district court has not yet addressed this issue, and must do so on remand. As a general matter, the applicable law was clearly established in January 2010 and clearly encompassed the type of behavior described in the inmates' affidavits at the time of the events relevant to this case.[24] Numerous judicial authorities have long provided that the use of force against an inmate is reserved for good faith efforts to maintain or restore discipline, rather than for the purpose of causing harm.[25] Even though there may be "notable factual distinctions between the [relevant] precedents" and the present case, "the prior decisions gave reasonable warning that the

---

[21] *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

[22] *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps.*, 215 F.3d 475, 480 n.13 (5th Cir. 2000); *McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 755 (5th Cir. 1980); *see also Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) ("On remand, the district court must conduct such proceedings as it determines to be necessary to ascertain whether a triable issue of fact exists . . . possibly including additional discovery . . . .").

[23] *See also Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) ("Prudence suggests that these qualified immunity claims should be addressed separately for Norris and Perry."); *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 883-84 (5th Cir. 2004).

[24] *See Pearson*, 555 U.S. at 236.

[25] *See Daniels*, 281 F.3d at 179-80 n.10; *Valencia*, 981 F.2d at 1446; *see also Mitchell*, 453 F. App'x at 477; *Noel*, 426 F. App'x at 249-50.

conduct then at issue violated constitutional rights."[26]

Indeed, courts have frequently found constitutional violations in cases where a restrained or subdued person is subjected to the use of force. The Third, Eleventh, and Eighth Circuits have each held that violent acts committed against a restrained inmate may give rise to a constitutional violation specifically under the *Hudson* analysis.[27] We likewise held in *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008), that a law enforcement officer "should have known" that a certain degree of force was impermissible after an arrestee had already been "restrained and subdued," and "was not resisting arrest or attempting to flee." Although that decision addressed the Fourth Amendment rather than the Fourteenth or Eighth Amendment, our analysis in *Bush*, 513 F.3d at 502, is nonetheless relevant to the present case. Indeed, as we explained in *Petta v. Rivera*, 143 F.3d 895, 912 (5th Cir. 1998), our decisions have "demonstrate[d] a tendency to 'blur' the lines between Fourteenth Amendment and either Fourth or Eighth Amendment excessive force standards, depending upon the particular factual context."[28]

Accordingly, based on the general framework set forth in *Hudson*, 503 U.S. at 7, the case law of our sister circuits,[29] and our related decision in *Bush*,

---

[26] *See Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (internal citations and quotation marks omitted); *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc).

[27] *See Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Skrtich v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002) ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated."); *Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1394-95 (8th Cir. 1997) ("We agree that the law was well established that striking an unresisting inmate . . . in the head while four other officers were restraining his limbs . . . is a violation of the Eighth Amendment[] . . . .").

[28] *See also Payne v. Parnell*, 246 F. App'x 884, 889 n.4 (5th Cir. 2007) ("[A] claim of excessive force by a law enforcement officer is analyzed under the same standard regardless of whether it arises under the Fourth Amendment or the Eighth Amendment.").

[29] *See Giles*, 571 F.3d at 326; *Skrtich*, 280 F.3d at 1303; *Davis*, 115 F.3d at 1394-95.

No. 13-10545

513 F.3d at 502, we conclude that Defendants-Appellees had reasonable warning that kicking, stomping, and choking a subdued inmate would violate the inmate's constitutional rights under certain circumstances.[30] On remand, if the district court ultimately finds summary judgment evidence showing that certain individual Defendants-Appellees committed such actions, then those individual Defendants-Appellees cannot invoke qualified immunity during these summary judgment proceedings.[31] As our case law requires, however, we emphasize that "these qualified immunity claims should be addressed separately" for each individual defendant.[32]

B.

On remand, the district must also consider the question of bystander liability for excessive use of force under *Hale*, 45 F.3d at 919, in the first instance.[33] In this context, we reject Defendants-Appellees' argument that Plaintiff-Appellant's claims are ineligible as a matter of law for analysis under an alternative theory of bystander liability. According to Defendants-Appellees, bystander liability cannot arise in the present case because Plaintiff-Appellant has failed to identify the specific individual or individuals responsible for the underlying use of excessive force. Defendants-Appellees'

---

[30] *See Hope*, 536 U.S. at 740; *Kinney*, 367 F.3d at 350. At the same time, we emphasize that we do not endorse a per se rule that no force may ever be used after an inmate has been subjected to measures of restraint—particularly if the effect of the restraint is only partial. For example, as we observed in *United States v. Sanders*, 994 F.2d 200, 209 (5th Cir. 1993), handcuffs "obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick." The extent to which measures of restraint have rendered unnecessary any further use of force under *Hudson*, 503 U.S. at 7, will depend on the specific facts and circumstances of each case.

[31] *See Brumfield*, 551 F.3d at 326; *Bazan*, 246 F.3d at 489.

[32] *Atteberry*, 430 F.3d at 253; *see also Meadours*, 483 F.3d at 421-22; *Hernandez*, 380 F.3d at 883-84.

[33] *See Arthur J. Gallagher & Co. v. Babcock*, 339 F. App'x 384, 388-89 (5th Cir. 2009); *Spectators' Comm'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001).

argument is unsupported, however, by any legal authority and is contrary to the reasoning applied by at least three circuits.

Bystander liability may be established where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[34]  In an unpublished decision, *Davis v. Cannon*, 91 F. App'x 327, 329 (5th Cir. 2004), we considered whether bystander liability had attached in a case involving a claim for use of excessive force against an inmate under the Eighth Amendment.  In *Gilbert v. French*, 364 F. App'x 76, 83 (5th Cir. 2010), and *Ibarra v. Harris County Texas*, 243 F. App'x 830, 835 & n.8 (5th Cir. 2007), we likewise considered whether bystander liability had attached in cases involving claims for use of excessive force against an arrestee under the Fourth Amendment.  Based on the close relationship described in *Petta*, 143 F.3d at 912-14, "between Fourteenth Amendment and either Fourth or Eighth Amendment excessive force standards,"[35] we therefore conclude that the theory of bystander liability is likewise applicable to claims for use of excessive force against pretrial detainees.  As a general matter, moreover, this rule constituted clearly established law for the purposes of qualified immunity in this case.  Indeed, prior to January 2010, the rule had already been applied consistently by district courts throughout the Fifth Circuit in cases involving both pretrial detainees and prison inmates.[36]

---

[34] *See Whitley v. Hanna*, 726 F.3d 631, 646-47 (5th Cir. 2013), *cert denied*, 134 S. Ct. 1935 (2014) (internal citations and quotation marks omitted).

[35] *See also Payne*, 246 F. App'x at 889 n.4.

[36] *See Williams v. Davis*, 3:09-CV-0296-B, 2009 WL 928318, at *3 (N.D. Tex. Apr. 6, 2009); *Edwards v. Mendoza*, CA C-08-371, 2008 WL 5246207, at *3 (S.D. Tex. Dec. 16, 2008); *Demouchet v. Rayburn Corr. Ctr.*, CIV. A. 07-1694, 2008 WL 2018294, at *5 (E.D. La. May 8, 2008); *Garza v. U.S. Marshals Serv.*, CIV.A. B-07-052, 2008 WL 501292, at *3 (S.D. Tex. Feb. 21, 2008); *Ndaula v. Holliday*, CV 04 0722 A, 2007 WL 1098954, at *4 (W.D. La. Mar. 20, 2007).

No. 13-10545

In the present appeal, Defendants-Appellees correctly observe that bystander liability arises under *Hale*, 45 F.3d at 919, only where the plaintiff can allege and prove "another officer's use of excessive force."[37] Defendants-Appellees have pointed to no authority, however, to support their argument that a plaintiff must identify with specificity the party responsible for the underlying use of force.

Indeed, the Seventh Circuit held explicitly in *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012), that "it is possible to hold a named defendant liable for his failure to intervene vis-à-vis the excessive force employed by another officer, even if the plaintiff cannot identify the officer(s) who used excessive force on him." In *Gaudreault v. Municipality of Salem, Massachusetts*, 923 F.2d 203, 207 & n.3 (1st Cir. 1990), the First Circuit also indicated that bystander liability may attach even where the officer most directly responsible for the violation of constitutional rights is never identified.[38] The Fourth Circuit applied the same reasoning in its unpublished decision in *Smith v. Ray*, 409 F. App'x 641, 649-50 (4th Cir. 2011).[39] In the absence of any contrary authority, therefore, we also conclude that where a detention officer knows that a fellow officer is committing a constitutional

---

[37] *See also Whitley*, 726 F.3d at 646; *Elliot v. Linnell*, 269 F. App'x 450, 451 (5th Cir. 2008).

[38] In *Gaudreault*, 923 F.2d at 207 & n.3, this claim was rejected on other grounds, although the First Circuit has subsequently repeated that bystander liability may be predicated on excessive use of force by an "unidentified officer." *See Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 52 (1st Cir. 2005) ("The plaintiff [in *Gaudreault*, 923 F.2d at 207 & n.3] sued four police officers who did not actively participate in another unidentified officer's assault on the plaintiff under detention. . . . The court explained that '[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's excessive force can be held liable under section 1983 for his nonfeasance.'").

[39] The Fourth Circuit rejected the bystander liability claim in *Smith*, 409 F. App'x at 649, because the plaintiff was unable to "show that Defendants were aware of the alleged assault." Nonetheless, the Fourth Circuit did consider the claim on its merits and accepted "as true the allegations by Smith that such an assault occurred at the hands of the Unknown Officer," which therefore provided the predicate for bystander liability. *See id.*

violation, has a reasonable opportunity to prevent the harm, and yet chooses not to act,[40] bystander liability may attach regardless of whether the directly responsible officer can be specifically identified.

In the present case, the district court's opinion contains no summary judgment analysis of the individual Defendants-Appellees' bystander liability. Although Defendants-Appellees do not contest that these detention officers were at least present during the relevant events, such officers may or may not have had "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it" under *Hale*, 45 F.3d at 919. The district court is therefore obliged to consider this question on remand, as well as whether any of the individual Defendants-Appellees may invoke qualified immunity as to this claim.[41]

IV.

Plaintiff-Appellant also argues that the district court improperly concluded that the record presented no genuine issue of material fact with respect to the detention officers' deliberate indifference to the deceased's medical needs. In Plaintiff-Appellant's view, the detention officers violated the en banc court's holding in *Hare*, 74 F.3d at 636, 648-49, by failing to contact the medical staff prior to extracting the deceased from his jail cell. This argument must be rejected.

To be actionable, the detention officers' conduct must demonstrate subjective awareness of a substantial risk of serious harm and a failure to take reasonable measures to abate this risk.[42] The "deliberate indifference"

---

[40] *See Whitley*, 726 F.3d at 646-47; *Hale*, 45 F.3d at 919.

[41] *Atteberry*, 430 F.3d at 253 (explaining that "qualified immunity claims should be addressed separately" for each individual defendant); *see also Meadours*, 483 F.3d at 421-22; *Hernandez*, 380 F.3d at 883-84.

[42] *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *Hare*, 74 F.3d at 636, 648-49 (analyzing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

standard, however, is not an obligation for government officials to comply with an "optimal standard of care."[43]  Rather, it is an obligation not to disregard any substantial health risk about which government officials are actually aware.[44] Under *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006), "[a] serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  Disagreements with diagnostic measures are insufficient to give rise to a claim of deliberate indifference to medical needs.[45]

Here, Plaintiff-Appellant does not present any significant evidence that the detention officers were deliberately indifferent to a substantial health risk. The need for the participation of specialized staff to perform the extraction of a mentally ill inmate from a jail cell is not "so apparent that even laymen would recognize" this alleged medical need.[46]  Nor does it appear, based on a fair reading of the deposition testimony cited by Plaintiff-Appellant in support of her argument regarding deliberate indifference to the deceased's medical needs, that such "treatment" had actually "been recommended"[47] either individually as to the deceased or generally as to all mentally ill inmates.  The existence of such a policy has no basis in the record on summary judgment.

In particular, Plaintiff-Appellant cites two pages of Captain Don Rowe's deposition testimony for the proposition that Dallas County Jail had a policy of permitting only specially trained staff to perform the extraction of mentally ill inmates from jail cells.  As Plaintiff-Appellant observes, Captain Rowe did

---

[43] *Easter v. Powell*, 467 F.3d 459, 463-64 (5th Cir. 2006); *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).

[44] *Easter*, 467 F.3d at 463-64; *Gobert*, 463 F.3d at 349.

[45] *See Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

[46] *See Gobert*, 463 F.3d at 345 n.12.

[47] *See id.*

indeed state that certain "mental health officers" receive "special training" at Dallas County Jail and "worked hand-in-hand with doctors during the day mainly to move mental health prisoners back and forth." But none of Captain Rowe's statements can be reasonably interpreted to mean that *only* these "mental health officers" were permitted to extract inmates from jail cells. Indeed, this portion of Captain Rowe's testimony does not even refer to the act of extracting inmates from jail cells or indicate what special competencies the mental health officers might possess. Later during his deposition, Captain Rowe confirmed explicitly that no "practice" or "policy" of Dallas County Jail would be violated if "a psychiatric patient was extracted from his cell without the officers who extracted him seeking medical attention prior to that extraction." Moreover, in view of the fact that the deceased had been transferred to the North Tower after assaulting one of the members of the medical staff less than twenty-four hours previously, it was understandable that the detention officers would seek to restrain the deceased before he would have any further contact with the medical staff.

Accordingly, even if the detention officers did not choose the optimal means of facilitating the deceased's access to medical care, this is insufficient to demonstrate deliberate indifference to the deceased's need for such care.[48] Where an inmate can show no more than "ordinary negligence," such lapses by jail staff do not demonstrate "a condition so threatening as to implicate constitutional standards."[49] The district court was therefore correct to conclude that no genuine issue of material fact remained with respect to Plaintiff-Appellant's claim for deliberate indifference to the deceased's medical needs. In the absence of any such underlying constitutional violation, the

---

[48] *See Coleman v. Sweetin,* 745 F.3d 756, 764 (5th Cir. 2014).

[49] *See id.*

district court acted within its discretion to refrain from performing the second step of the qualified immunity analysis.[50]  Accordingly, summary judgment must be affirmed as to Plaintiff-Appellant's claim for deliberate indifference to the deceased's medical needs.

V.

Finally, we address Plaintiff-Appellant's claim of municipal liability against Defendant-Appellee Dallas County under *Monell*, 436 U.S. at 694.  As is well established, every *Monell* claim requires "an underlying constitutional violation."[51]  It appears from the briefing and record on appeal that Plaintiff-Appellant's *Monell* claim primarily relies for its underlying constitutional violation on her claim for deliberate indifference to the deceased's medical needs—a claim that we have rejected.  However, because it is at least arguable that portions of Plaintiff-Appellant's *Monell* claim also relate to her claim for excessive force, we address Plaintiff-Appellant's *Monell* claim.

Plaintiff-Appellant has framed her claim of municipal liability as a challenge to "five actual and/or *de facto* policies or customs."  These five lines of argument, however, are all addressed to a single, central issue.  That is, according to Plaintiff-Appellant, the detention officers responsible for the death of the deceased on January 22, 2010, lacked any specialized training relating to the extraction of inmates with mental illness from jail cells.  Although the medical personnel at Dallas County Jail had received training that was more generally relevant to inmates' mental health, those personnel were located elsewhere in the facility.  And even though the deceased was mentally ill, the deceased was "disciplined" for his attack on the nurse at

---

[50] *See Pearson*, 555 U.S. at 236.

[51] *See Whitley*, 726 F.3d at 648 ("[I]nadequate supervision, failure to train, and policy, practice or custom claims fail without an underlying constitutional violation."); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866-67 (5th Cir. 2012).

midnight on January 21, 2010, with "banishment" to the North Tower—which was too remote for the medical personnel to extract the deceased from his cell when needed. Accordingly, Plaintiff-Appellant's *Monell* claim essentially challenges Defendant-Appellee Dallas County's failure to provide the proper training to the personnel in the North Tower.

As Plaintiff-Appellant correctly argues, it is well established that "a municipality's policy of failure to train" its personnel can give rise to liability under 42 U.S.C. § 1983.[52] In particular, to succeed on a *Monell* claim arising from a municipality's failure to adopt an adequate training policy, a plaintiff must demonstrate that: "(1) [the municipality's] training policy procedures were inadequate, (2) [the municipality] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused [the constitutional violation]."[53] In the present case, Plaintiff-Appellant's claim for municipal liability fails as to the second component of this three-part framework.

Under the applicable case law, there are two ways in which a plaintiff can establish a municipality's deliberate indifference to the need for proper training. The first and more typical approach, as we explained in *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010) (citations and quotation marks omitted), is to demonstrate that a municipality had "[n]otice of a pattern of similar violations," which were "fairly similar to what ultimately transpired" when the plaintiff's own constitutional rights were violated.[54] The

---

[52] *See Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation and internal quotation marks omitted); *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010).

[53] *Sanders-Burns*, 594 F.3d at 381 (citing *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996)).

[54] *See also Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) ("While the specificity required should not be exaggerated, our cases require

second approach, as the Supreme Court hypothesized in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989), and analyzed further in *Connick v. Thompson*, 131 S. Ct. 1350, 1360-61 (2011), is the limited exception for "single-incident liability" in a "narrow range of circumstances" where a constitutional violation would result as "the highly predictable consequence" of a particular failure to train.[55]  In the present case, Plaintiff-Appellant has failed to present competent evidence that would satisfy either analysis on summary judgment.

As to the first approach, Plaintiff-Appellant has pointed to no pattern of constitutional violations bearing sufficient resemblance to the events surrounding the death of the deceased.  Instead, Plaintiff-Appellant has submitted a report produced pursuant to 42 U.S.C. § 1997b by the Department of Justice addressing conditions at Dallas County Jail in 2006.  The cited portions of the report do indeed indicate that, as of that date, the Dallas County Jail did not "appropriately assess and treat inmates with mental illnesses."

The examples listed in the report, however, are all instances in which mentally ill inmates suffered harm due to neglect in the course of medical treatment.  According to the report, one inmate went for more than a month without receiving a prescribed reassessment of his suitability for certain psychotropic medications.  Another inmate was on a hunger strike for several months without receiving any "medical evaluation regarding her nutrition and state of hydration" until finally she had to be hospitalized.  A third inmate "suffered from a significant lack of continuity of care" after four different members of the medical staff made conflicting diagnoses and prescribed conflicting treatment without referring to one another's assessments.  That inmate's mental health "deteriorated to the point that Jail staff repeatedly

---

that the prior acts be fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act have involved injury to a third party.").

[55] *See also Brumfield*, 551 F.3d at 329.

observed him eating his own feces."

These instances of neglect reported by the Department of Justice have too little in common with the circumstances of the present case. These instances could not have provided Defendant-Appellee Dallas County with "[n]otice of a pattern of similar violations" that would establish deliberate indifference to the allegedly unconstitutional violence challenged by Plaintiff-Appellant in the present case.[56] Most critically, none of the instances cited in the report involved the extraction of mentally ill prisoners from jail cells or even detention officers' use of force in general. The report by the Department of Justice, therefore, fails to describe constitutional violations that were "'fairly similar to what ultimately transpired'" in the present case, as our precedents require.[57]

As for the second approach to demonstrating a municipality's deliberate indifference based on the failure to train, Plaintiff-Appellant has not established the applicability of the "limited exception for single-incident liability."[58] As the Supreme Court explained with respect to single-incident liability in *Connick*, 131 S. Ct. at 1363, "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." On the contrary, the risk must be "so predictable that failing to train the [municipal personnel] amounted to *conscious disregard*" for the injured party's rights.[59] But the record in this case contains no proof, whether in the form of expert evidence or otherwise, that the extraction of mentally ill inmates from jail cells requires specialized training.[60]

---

[56] *See Sanders-Burns*, 594 F.3d at 380-81; *Davis*, 406 F.3d at 383.

[57] *See Sanders-Burns*, 594 F.3d at 381 (quoting *Davis*, 406 F.3d at 383).

[58] *Brumfield*, 551 F.3d at 329.

[59] *See Connick*, 131 S. Ct. at 1365; *Bohannan v. Doe*, 527 F. App'x 283, 300 (5th Cir. 2013); *Martinez v. Maverick Cnty.*, 507 F. App'x 446, 449 n.3 (5th Cir. 2013).

[60] *See, e.g.*, *Walker v. Upshaw*, 515 F. App'x 334, 336-38 (5th Cir. 2013).

No. 13-10545

There is no suggestion, for example, that any other municipality in the United States provides such specialized training to detention officers. Plaintiff-Appellant's evidence therefore does not demonstrate the same level of "patently obvious" risks of "recurring constitutional violations" that may occur, as hypothesized by the Supreme Court in *Canton*, 489 U.S. at 390, and *Connick*, 131 S. Ct. at 1361-63, in instances where a municipality sends "armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."[61]

To summarize, Plaintiff-Appellant has failed to identify any pattern of past constitutional violations similar to the events of the present case, and has not demonstrated that the prospect of constitutional violations should have been "highly predictable" or "patently obvious" in the present case.[62] Accordingly, Plaintiff-Appellant's claims cannot proceed on the basis that Defendant-Appellee Dallas County failed to provide the proper training to the personnel located in the North Tower. Summary judgment must therefore be affirmed as to Plaintiff-Appellant's claims under *Monell*, 436 U.S. at 694.

VI.

For these reasons, we conclude that the record presents genuine issues of material fact with respect to Plaintiff-Appellant's claim for excessive force. Therefore, we REVERSE and REMAND in part, so that the district court may consider in the first instance whether any or all of the individual Defendants-Appellees may proceed to trial on a theory of direct liability for use of force or, in the alternative, on a theory of bystander liability. The district court should also consider in the first instance whether any of the Defendants-Appellees are individually entitled to qualified immunity in the present case.

---

[61] *Connick*, 131 S. Ct. at 1361-63.

[62] *See id.* at 1361; *Bohannan*, 527 F. App'x at 300; *Martinez*, 507 F. App'x at 449 n.3.

No. 13-10545

As to Plaintiff-Appellant's claim against the individual Defendants-Appellees for deliberate indifference to the deceased's medical needs, however, we AFFIRM the judgment of the district court. We also AFFIRM summary judgment as to Defendant-Appellee Dallas County's municipal liability.

REVERSED and REMANDED in part, and AFFIRMED in part.