# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 31, 2022

Lyle W. Cayce
Clerk

No. 17-40996

Robert A. Byrd,

*Plaintiff—Appellant*,

*versus*

Tony Harrell; Kelli Ward; Michael Black,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC 6:14-CV-986

---

Before Wiener, Graves, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

While violently resisting several prison guards, prisoner Robert Byrd's arm was broken by one guard's baton strikes. Byrd sued for excessive force. The district court granted the guard summary judgment based on qualified immunity. We affirm.

No. 17-40996

I.

In July 2014, Byrd was serving concurrent life and 99-year sentences for capital murder and organized crime convictions in the Texas Department of Criminal Justice's Coffield Unit in Tennessee Colony, Texas.[1] On the morning of July 15, Byrd was cited for a disciplinary violation for throwing water on an officer, Jeanenne Dehart. Just after noon he was cited again for throwing water on another officer. At approximately 2:45 P.M., prison officials authorized the use of chemical agents and a five-man force move team, led by Sergeant Tony Harrell, to gain Byrd's compliance with the prison's restraint procedure for a strip search. Dehart witnessed with a handheld video camera. A hallway surveillance camera also captured the ensuing altercation.

Harrell approached Byrd's cell and asked Byrd to comply with a strip search. When Byrd refused, Harrell sprayed a chemical agent into Byrd's cell. In response, Byrd wrapped his face in a jacket and towels, rendering the spray ineffective. Byrd hollered, "Is that all you got?"

The five-man force team then moved into the hallway. Harrell asked again, "Are you going to comply?" Byrd responded, "No." For nearly a minute, Harrell waited in vain for the chemical agent to take effect. Harrell initiated the force team and radioed "open 20"—Byrd's cell.

As the cell door edged open, Byrd pushed out and into the force team shields. The team pushed back, and Harrell swung his riot baton at Byrd's legs. At this point, the handheld camera went dark, though the sound

---

[1] *See Byrd v. State*, No. 2-08-124-CR, 2009 WL 672390, at *1 (Tex. App. Mar. 12, 2009); *Byrd v. State*, No. 10-08-390-CR, 2009 WL 3048612, at *1 (Tex. App. Sept. 23, 2009).

2

continued to record.[2] From the view of the surveillance camera, Byrd fell to one knee and then to the ground. Harrell swung his baton at Byrd's arm, as Dehart twice announced that the camera had stopped working.

Over the next 20 seconds, Harrell stepped back and observed the force team wrestle to restrain Byrd. One officer yelled, "Put your arm out!" Another officer grabbed Byrd in a chokehold. Dehart again announced that the camera was not working and then that "Offender has been subdued." Moments later, Harrell stepped toward the dogpile and swung a baton at Byrd's arm. The force broke Byrd's arm, and he fell unconscious. For the next two minutes, the team placed Byrd's arms and legs in restraints, before standing him up to walk him to the infirmary.

A post-incident use of force report claimed Harrell's baton strike was motivated by his spotting a weapon in Byrd's hand. Photos in the record show a crude wooden shank reportedly recovered during the incident. Byrd denies (and continues to deny) he had any weapon.

Byrd filed two grievances with prison grievance counsellor (and defendant) Kelli Ward. Use of Force Monitor Evelyn Jenkins heard the grievances and referred them to the Office of Inspector General for review. Jenkins's report opined that Harrell had used excessive force against Byrd in striking his arm and stated that the video showed no weapon in Byrd's hand. The inspector general's office, however, disagreed and found Harrell's actions appropriate.

In 2014, Byrd brought a *pro se* lawsuit against Harrell and Ward. He alleged Eighth Amendment violations for excessive force, failure to protect, and failure to provide medical treatment. Harrell and Ward moved for

---

[2] At the moment before the handheld's malfunction, the surveillance footage shows that Harrell's baton might have hit the camera lens during a backswing.

No. 17-40996

summary judgment, invoking qualified immunity. Harrell claimed he used force in response to Byrd's having a shank in his hand. Ward argued she had not been deliberately indifferent to Byrd's grievances and had no knowledge or control over his medical care. Defendants submitted video footage, grievance reports, use of force reports, and evidence of Byrd's past noncompliance and weapon possession.

The district court agreed Harrell was entitled to qualified immunity. Examining the summary judgment evidence and methodically analyzing the five factors from *Hudson v. McMillian*, 503 U.S. 1 (1992), the court assumed that Byrd did not have a weapon and granted summary judgment in Harrell's favor regardless, finding no constitutional violation. As for the failure-to-protect, failure-to-treat, and failure-to-decontaminate claims, the court granted summary judgment for Ward. Byrd appealed.

## II.

We review a summary judgment *de novo. Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019) (citation omitted); Fed. R. Civ. P. 56(a). When a government official has asserted qualified immunity, "the burden shifts to the plaintiff to 'rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct.'" *Bourne*, 921 F.3d at 490 (quoting *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)). We view the evidence in the light most favorable to Byrd and draw all inferences in his favor, "so long as they are not 'blatantly contradicted' or 'utterly discredited' by a video recording." *Id.* at 491–92.

## A.

We begin and end by asking whether Byrd showed a genuine dispute about whether Harrell used excessive force. When prison officials use force

4

to maintain or restore order in a prison, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. We focus on the prison official's "subjective intent" and determine it "by reference to the well-known *Hudson* factors." *Cowart v. Erwin*, 837 F.3d 444, 452–53 (5th Cir. 2016). They are "(1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." *Bourne*, 921 F.3d at 491 (cleaned up). As explained below, we find no error in the district court's application of the *Hudson* factors.

(1)

All agree Byrd suffered more than a *de minimis* injury. The first factor weighs in Byrd's favor. *See Cowart*, 837 F.3d at 453; *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010).

(2)

But force was obviously needed. The officers faced a violent inmate who had previously told Ward that he "will kill before [he] get[s] killed." On the day in question, Byrd had poured water on officers, refused to comply with orders for a strip search, resisted even after being sprayed with chemical agents, and violently forced his way out of his cell. Byrd's determined resistance required determined force in response. The second factor weighs in Harrell's favor.

(3)

The third factor asks whether striking Byrd's arm was needed to subdue him. This factor is a closer call. Harrell argues Byrd kept resisting until "the final blow," necessitating "a continuum of force that escalated

parallel to Byrd's resistance." The video supports the view that Byrd was steeled to resist anything the guards threw at him—for instance, his response to being sprayed with mace was, "Is that all you got?" He then forced his way out of his cell through five guards with riot shields. On the other hand, Byrd was on the ground with four men on top of him and one holding him in a chokehold before Harrell struck his arm. And we must assume, as did the magistrate judge and district court, that Byrd did not have a weapon. So, the application of force—while obviously necessary—cannot be justified by the need to neutralize an armed prisoner.

Nonetheless, Harrell's strikes came at the culmination of a violent encounter with a prisoner determined to fight through chemical spray and riot shields. The Supreme Court has told judges not to micro-manage the force necessary to quell such volatile situations. We are to accord prison officials "wide-ranging deference" in "prison security measure[s] taken in response to an actual confrontation with riotous inmates." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986); *see also, e.g.*, *Waganfeald v. Gusman*, 674 F.3d 475, 485 (5th Cir. 2012) (emphasizing "deference" owed officials in the "execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979))). So, this factor favors Harrell, if only modestly.

### (4)

We next ask whether Harrell subjectively perceived a reasonable threat when he struck Byrd or instead acted maliciously to cause harm. *Bourne*, 921 F.3d at 491. There is no dispute that Harrell faced, as he puts it, a "hostile, combative, utterly noncompliant" prisoner who was committed to violent resistance.

No. 17-40996

Byrd counters that there is evidence that Harrell maliciously broke his arm in retaliation for another officer's resignation after Byrd accused the officer of using excessive force. This theory lacks record support. While it appears true that another officer resigned his position the day before this altercation, Byrd offers only his own personal belief to support his theory of retaliation.

That speculation does not create a genuine fact issue as to Harrell's motivation for striking Byrd. The altercation would not have taken place but for Byrd's violent resistance. Nothing in the record suggests Harrell used the melee as a pretext to punish Byrd for another officer's resignation. So, it is undisputed that Harrell deployed "in a good-faith effort to maintain or restore discipline" instead of "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. This factor weighs against Byrd.

(5)

Finally, the efforts to temper the severity of the force. The video shows that Byrd, although restrained by several guards, continued to violently resist. Harrell struck his arm with the baton and then stopped striking him the moment Byrd stopped resisting. As explained above, judges should not attempt to micro-manage the amount of force used to subdue a violently resisting inmate. *See Whitley*, 475 U.S. at 321–22. This factor favors Harrell.

\*     \*     \*

In sum, we see no error in the district court's application of the *Hudson* factors to the undisputed facts here.

III.

Finally, Byrd also challenges the dismissal of his failure-to-decontaminate, failure-to-provide-medical-treatment, and failure-to-protect

claims. Byrd failed to show Ward knew of the need to decontaminate or provide medical treatment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). And as for Ward's treatment of Byrd's grievances, Byrd's vague assertions that some unidentified officers had threatened him could not have put Ward on notice of a substantial risk of harm to the prisoner. *See Farmer*, 511 U.S. at 837; *see also, e.g.*, *Armstrong v. Price*, 190 F. App'x 350, 351–53 (5th Cir. 2006) (unpublished). The district court properly held Ward entitled to qualified immunity and dismissed these claims as meritless.

*     *     *

The district court's judgment is AFFIRMED.

No. 17-40996

James E. Graves, Jr., *Circuit Judge*, concurring:

I agree with the result in this case because Byrd's asserted right was not clearly established when this case's events happened in 2014. But I would take this opportunity to establish that right.

Under the undisputed evidence—and viewing the disputed evidence in the light most favorable to Byrd[1]—a jury could rationally conclude that Sergeant Harrell maliciously and unnecessarily struck Byrd with a baton with bone-breaking force. The parties dispute whether Byrd was armed, but the surveillance footage clearly shows that Byrd's left hand was empty when Sergeant Harrell struck Byrd's left forearm and there is no summary judgment evidence showing that Byrd was otherwise armed. And it is undisputed that Sergeant Harrell repeatedly struck Byrd's left arm with a

---

[1] Although courts may not resolve credibility issues on summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions"), inconsistencies in the defendants' description of events are noteworthy and would be relevant at trial. *Cf. Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F. 2d 77, 81 (5th Cir. 1987) ("We hold that where a party opposing summary judgment alleges that the affidavits upon which the motion is based are perjured, and presents evidence that could lead a reasonable person to doubt the credibility of the affiant's testimony, summary judgment should not be granted."). After the incident, Sergeant Harrell told superiors that Byrd "came out . . . with a weapon," so Byrd struck Harrell "to prevent injury to staff and [him]self." A report written right after the incident states that Byrd "came out on the run" holding an improvised weapon with which he "attacked" staff, and that Byrd "was fighting with staff very aggressively during the use of force," which aggression continued after a weapon was recovered. The report also denied that staff choked Byrd. This report, unsurprisingly, deemed Harrell's use of force justified. And Officer Dehart, the officer who filmed the incident, told her supervisors that she dropped the camera during the incident, rendering useless the footage she took. But when an administrative monitor reviewed surveillance footage, she concluded that these statements were exaggerations at best and, in some instances, outright fabrications. For example, the administrative monitor concludes from the footage that: (i) Byrd did not have a weapon; (ii) staff continued kicking Byrd after he was subdued; (iii) staff choked Byrd; (iv) Officer Dehar did not actually drop the camera.

baton with enough force to break it, while the arm was free and not holding a weapon, and while four guards pinned Byrd's body and a fifth held Byrd's neck in a chokehold. Even if Byrd charged out of the cell, a jury might well conclude that the need for bone-breaking force had been negated by the time Sergeant Harrell repeatedly struck Byrd with a riot baton, and therefore that Sergeant Harrell acted "maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). *Cf. Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."); *Aucoin v. Cupil*, 958 F.3d 379, 380 (5th Cir.), *cert. denied*, 141 S. Ct. 567 (2020) ("[W]hen a prison inmate engages in willful misconduct, a prison guard may use reasonable force to restrain him—but after the inmate submits, there is no need, and thus no justification, for the further use of force."). That is enough to find a constitutional violation in this case.

Although the majority recognizes that Sergeant Harrell used an unjustifiable degree of force, it nonetheless concludes that this *Hudson* factor actually *favors* Sergeant Harrell, albeit "modestly," simply because we must "accord prison officials 'wide-ranging deference.'" *Ante*, at 6. Though we certainly owe such deference, we also have a responsibility to identify constitutional violations. And we must identify the line separating permissible from impermissible force not just to preserve rights, but to inform prison officials about what conduct will expose them to the burdens of litigation. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (noting that the purpose of qualified immunity's clearly-established prong is to "giv[e] fair and clear warning to officers" about what conduct will expose them to liability). The undisputed evidence in this case shows a constitutional violation. We should unequivocally state that conclusion.

Nonetheless, I concur in the majority's judgment because Sergeant Harrell is entitled to qualified immunity under our caselaw, at least as it stood when this case's events happened. In 2014, we declined to "endorse a per se rule that no force may ever be used after an inmate has been subjected to measures of restraint—*particularly if the effect of the restraint is only partial*." *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 479 n.30 (5th Cir. 2014), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (emphasis added). That holding insulates Sergeant Harrell from liability. But I would take this opportunity to establish for future cases that prison officials may not continue to apply bone-breaking force to an inmate who is partially restrained but who poses no threat to any officer, even if the inmate had earlier necessitated the use of some force.